UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JERRY HANNAH,

      Plaintiff,

v.                           Civil Action No. 2:20-cv-00617

MULLINS FAMILY FUNERAL HOME LLC;
and JOSEPH MULLINS, individually,

      Defendants.

MEMORANDUM OPINION AND ORDER

      Pending is plaintiff Jerry Hannah's motion to remand, filed September 24, 2020.  ECF No. 4.

I.  Background

      This action was filed in the Circuit Court of Mingo County on August 19, 2020.  ECF No. 1-1 (Complaint).  The complaint alleges that "in or around June 2017," Hannah, a resident of Kermit, West Virginia, entered into an agreement in Mingo County, West Virginia with defendant Joseph Mullins ("Mullins"), a resident of Inez, Kentucky, whereby Hannah would invest $80,000.00 in defendant Mullins Family Funeral Home LLC ("the Funeral Home") in exchange for thirty percent ownership of the Funeral Home and thirty percent of "all dividends and/or

other distributions from the business." Id. at ¶¶ 1, 3, 9.[1]
According to the complaint, Hannah would function as a "silent
partner" under the agreement while Mullins would serve as the
funeral director and receive a salary from the entity. Id. at
¶¶ 9, 13.

Hannah claims that Mullins registered the Funeral
Home, which is located in Warfield, Kentucky, with the Secretary
of State of the Commonwealth of Kentucky on June 7, 2017. Id.
at ¶ 12. Hannah alleges that he deposited $80,000.00 in the
Funeral Home's account between June 8, 2017, and July 25, 2017,
pursuant to the agreement between the parties. ECF No. 1-1, at
¶ 11.

Over time, the business relationship between Hannah
and Mullins deteriorated. Id. at ¶ 14. The complaint alleges
that, on an unspecified date, Hannah proposed that the Funeral
Home implement a formal operating agreement and create a board
of directors for oversight of the entity, which Mullins

---

[1]     Hannah, in subsequent filings, has characterized the
agreement as a verbal arrangement. ECF No. 33 (Plaintiff's
Response to Show Cause Order), at 2 ("Because the individual
parties had known each other for the better part of four
decades, the parties verbally agreed to the arrangement,
Plaintiff provided the start-up capital, and MFFH began to
operate."). The propriety and binding nature of such an
agreement is not directly at issue in the context of remand and
the jurisdictional issues raised therein.

rejected.  Id. at ¶¶ 15-18.  Suspicious of Mullins' management of the Funeral Home, Hannah "exercised his rights [as] a partner . . . to inspect the financial documents of the company" and audited the Funeral Home "in late 2019" after Mullins turned over the relevant records.  Id. at ¶¶ 18-19.  According to Hannah, "[t]he audit found that not only had defendant Mullins failed to tender any significant dividend to Mr. Hannah, Defendant Mullins had been paying personal bills out of the MFFH account, paying family members' bills from the MFFH financial accounts, and ordering and paying for pornographic material out of the MFFH account."  Id. at ¶ 20.

Hannah states that he again called for an operating agreement and board of directors for oversight of the Funeral Home.  Id. at ¶ 21.  The plaintiff claims that Mullins "seem[ed] to agree" to these reforms, but after Hannah drafted the proposed operating and board of directors agreements, Mullins "refused to put those processes in place."  Id. at ¶¶ 22-24.

Hannah asserts that "Defendant Mullins continues to squander company assets and self-deal in furtherance of his personal interest while neglecting to adhere to the parties' agreement and protect Mr. Hannah's interest in the business." Id. at ¶ 25.  He also claims that "[b]ecause of his partnership interest in MFFH, Plaintiff has been required to make certain

tax filings with the IRS and other governing tax entities."  Id. at ¶ 26.

The complaint alleges seven counts: Count I, breach of contract against Mullins; Count II, civil conspiracy against Mullins and the Funeral Home; Count III, conversion against Mullins and the Funeral Home; Count IV, declaratory judgment that a "legal partnership existed among the parties" pursuant to W. Va. Code § 55-13-1, et seq.; Count V, unjust enrichment against Mullins and the Funeral Home; Count VI, "tortious interference" against Mullins and the Funeral Home; and Count VII, breach of fiduciary duty against Mullins.  Id. at ¶¶ 27-44. Hannah requests the following relief:

    A.  A declaration the partnership exists between he parties;
    B.  Actual Damages;
    C.  Compensatory Damages;
    D.  Damages for emotional distress, annoyance, and inconvenience;
    E.  Disgorgement of Defendants' profits and restitution;
    F.  Punitive and exemplary damages;
    G.  Pre-judgment interest;
    H.  Attorney Fees and Cost; and
    I.  All other equitable and legal relief which is deemed fair and just by the Court.

Id. at ¶ 44.  The complaint also states: "The Plaintiff stipulates the amount in controversy in this matter is less than seventy-five thousand dollars ($75,000)."  Id. at ¶ 8.

The defendants removed the action to this court pursuant to 28 U.S.C. § 1446 on September 18, 2020.  ECF No. 1 (Notice of Removal).  The notice of removal asserts that, based on the allegations contained in the complaint, Hannah is a resident of West Virginia, Mullins is a resident of Kentucky, and the Funeral Home is a corporation with its principal offices in Warfield, Kentucky.  Id. at ¶¶ 1-3.  The notice of removal proceeds to state that diversity of citizenship jurisdiction exists inasmuch as:

> there is complete diversity between the parties in accordance with 28 U.S.C. §1332(a).  At the time the Complaint was filed and as of the filing of this Notice, Plaintiff was purportedly a citizen of West Virginia, Defendant Mullins was a citizen of Kentucky, and Defendant MFFH was an [sic] limited liability company formed and headquartered in the Commonwealth of Kentucky.

Id. at ¶ 7.  The defendants claim that the amount in controversy exceeds $75,000.00 as required by 28 U.S.C. §1332(a) inasmuch as: Hannah requests damages and equitable relief that allegedly arise from an $80,000.00 investment; the complaint's amount in controversy stipulation "does not qualify as a truly binding pre-removal stipulation, signed by both counsel and cllient [sic], and explicitly limiting recovery as contemplated by McCoy v. Erie Insurance Company, 147 F.Supp.2d 481, 485 (S.D. W.Va. 2001)"; and the plaintiff alleges that:

5

> Defendants' acts and omissions have caused him to
> suffer financial difficulties and incur unnecessary
> attorney fees and costs, conspired to interfere with
> Plaintiff's business expectancy, and prays for actual
> damages, compensatory damages, damages for emotional
> distress, annoyance and inconvenience, disgorgement of
> Defendants' profits and restitution, both punitive and
> exemplary damages, and attorney's fees.

Id. at ¶¶ 8-10.

Hannah filed the motion to remand on September 24, 2020. ECF No. 4 (Motion to Remand). In this motion, Hannah challenges only the amount in controversy. See id.; ECF No. 4, at 3 (Memorandum in Support of Motion to Remand) ("It is uncontested the parties to this claim are diverse. The amount in controversy is in dispute.").

The defendants responded on October 8, 2020, opposing remand. ECF No. 7 (Memorandum Opposing Motion to Remand). They have produced several emails in support of their position that the amount in controversy requirement is met. ECF No. 7-1 (Email Exhibits to Memorandum Opposing Motion to Remand). The first is an April 13, 2020 email from attorney Jaryd H. Crum on behalf of Mullins to Nathan D. Brown, counsel of record for Hannah in this action, that "make[s] an initial offer of $85,000.00 to purchase Mr. Hannah's 30% interest in Mullins Family Funeral Home."[2]  Id. at 1.  The second email is an April

---

[2]    Unlike Brown, Crum is not counsel of record in this action. Howard M. Persinger, III represents the defendants.

14, 2020 response from Brown on behalf of Hannah to Crum, rejecting the offer and stating that "[Hannah's] only desire is to get the agreements in place provided to allow for oversight of the business by himself, Joe, and in independent persons as well." Id. at 3.  The third email appears to be an April 17, 2020 response by Brown to an undisclosed follow-up offer by Crum and Mullins.  Id. at 4.  This third email states that "[Hannah] has rejected the 110k and relayed [he] has no interest in selling his 30% interested [sic, interest] in MFFH at this point." Id. at 5.  Hannah filed a reply on October 11, 2020, and the matter was submitted for review.  ECF No. 8 (Reply in Support of Motion to Remand).

     The court, after identifying the various theories offered by the parties concerning the legal constitution (partnership, LLC, and corporation) of the Funeral Home and concluding that the notice of removal failed to adequately allege complete diversity, ordered the defendants on December 28, 2020, to show cause why this action should not be remanded for lack of complete diversity.  ECF No. 27 (Show Cause Order).

     The defendants responded to the show cause order on January 13, 2020, and provided several pieces of evidence in support of complete diversity.  ECF No. 31 (Defendants' Response to Show Cause Order).  First, the defendants offer the affidavit

7

of Mullins, who avers that he is a member and manager of the
Funeral Home and a citizen of Kentucky.  ECF No. 31-1 (Affidavit
of Joseph Mullins), at ¶ 1.  Mullins states that, with the help
of Nathan Brown, Hannah's counsel in this action, he registered
the Funeral Home as a Kentucky LLC.  Id. at ¶ 2.  He further
affirms:

> Mr. Brown stated that Mr. Hannah did not, under any
> circumstances, wish to be listed as a member of MFFH
> or in any capacity.  Based upon my conversations with
> Mr. Brown during registration, I understod [sic] that
> I would be the sole member and manager of MFFH with
> Mr. Hannah as a "silent investor" uninvolved in day-
> to-day business of managing MFFH.  Consistent
> therewith, in 2018, 2019, and 2020, I caused MFFH to
> file the attached online annual reports with the
> Commonwealth of Kentucky which list me as the sole
> Member of MFFH . . . .

Id.  Mullins continues by stating, "Later in 2019, Mr. Hannah
and I had discussions/negotiations about implementing an
Operating Agreement for MFFH in which both of us would be listed
as members, but no agreement was executed prior to the filing of
this lawsuit."  Id. at ¶ 3.  Finally, Mullins avers:

> It is my understanding that Mr. Hannah's accountant,
> Michelle Hughes, E.A., prepared and filed MFFH's 2017
> tax return as [a] Subchapter S Corporation, listing
> both me and Mr. Hannah as "Shareholders."  However,
> for the returns for 2018 and 2019, on behalf of MFFH,
> I consulted with a local accountant, Brad Hall CPA,
> who helped MFFH prepare and file federal income tax
> returns as a sole proprietorship/single member limited
> liability company.

Id. at ¶ 4. Indeed, Hannah concedes that, despite this 2017 tax filing, the Funeral Home is not an S Corporation. ECF No. 33, at 5-6 (Plaintiff's Response to the Show Cause Order). The 2018, 2019, and 2020 annual reports discussed by Mullins in his affidavit are also attached to the defendants' response to the show cause order, and they reflect that Mullins filed these documents with the Secretary of State of the Commonwealth of Kentucky and listed himself as the sole member of the LLC. ECF No. 31-1, at 3-5 (Annual Reports to the Secretary of State).

Hannah filed a response on January 18, 2021, now contending that complete diversity does not exist. ECF No. 33. Attached to the response is an August 17, 2020 email from Hannah to Brown that includes what appears to be a scanned copy of transactions through which Hannah paid $79,000.00 between June 8, 2017, and July 25, 2017, to the Funeral Home in "Startup" and "Startup In." ECF No. 33-1 (Transaction Scans). Hannah also provides scanned copies of checks signed by Mullins and dated December 4, 2017 and April 9, 2019, from the Funeral Home to Hannah for "Investment payment" and "Quarterly stockholders distribution," respectively. ECF Nos. 33-3 and 33-4 (Check Scans). Hannah additionally offers a copy of the Funeral Home's articles of organization. ECF No. 33-5 (Articles of Organization). They specify that the Funeral Home is a Kentucky

LLC formed "pursuant to KRS Chapter 275" to be managed by members and organized by Mullins.  Id.  The articles bear an electronic notation from the Secretary of State of the Commonwealth of Kentucky indicating that they were "received and filed" on June 7, 2017.  Id.

Finally, Hannah offers his own affidavit.  ECF No. 33-6 (Affidavit of Jerry Hannah).  He states, in relevant part, that he and Mullins agreed that he would maintain a thirty percent interest, "including dividends and/or distributions," in the Funeral Home as a "silent owner/member" in exchange for $80,000.00 in initial startup capital.  Id. at ¶¶ 2-5. According to Hannah, it was agreed that Mullins "would manage the day-to-day business affairs of MFFH and server [sic, serve] as the funeral director."  Id. at ¶ 4.

Hannah affirms that he "directed Mr. Mullins to visit [his] personal lawyer, Nathan Brown, to file the organizational papers for the LLC with the State of Kentucky," and, "[t]hat pursuant to our agreement that I maintain silent ownership in MFFH, it was agreed that I would not be listed on the Articles of Organization."  Id. at ¶¶ 6-7.  He states that the December 4, 2017 and April 9, 2019 checks were distribution checks made pursuant to the agreement.  Id. at ¶ 8.  Hannah also avers that he and Mullins met with their lawyers present in Inez, Kentucky

in December 2019, at which meeting Mullins agreed that Hannah had a thirty percent interest in the Funeral Home and that such ownership should be reduced to writing in a formal operating agreement.  Id. at ¶ 9.  He then states that rather than reducing the agreement to writing, Mullins had his lawyer contact him to offer $85,000.00 and subsequently $110,000.00 for his thirty percent share.  Id. at ¶ 11.  Hannah affirms that he has not relinquished his thirty percent share as a "silent member/owner" in the Funeral Home since its inception.  Id.

## II.  Legal Standard

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  That said, "[f]ederal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (citations omitted). "Because removal jurisdiction raises significant federalism concerns, we must strictly construe removal jurisdiction" and remand an action "[i]f federal jurisdiction is doubtful."  Mulcahey v. Columbia

Organic Chemicals Co., 29 F.3d 148, 151 (4th Cir. 1994). "The burden of demonstrating jurisdiction resides with 'the party seeking removal.'" Md. Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 260 (4th Cir. 2005) (quoting Mulcahey, 29 F.3d at 151). "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).

Under 28 U.S.C. § 1332(a)(1), federal district courts have original diversity of citizenship jurisdiction in "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States . . . ." "In this circuit, it is settled that the test for determining the amount in controversy in a diversity proceeding is 'the pecuniary result to either party which [a] judgment would produce.'" Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002) (quoting Gov't Emps. Ins. Co. v. Lally, 327 F.2d 568, 569 (4th Cir. 1964). "If a complaint 'does not allege a specific amount of damages, the removing defendant must prove by a preponderance of the evidence that the amount in controversy exceeds [$75,000].'" Francis v. Allstate Ins. Co., 709 F.3d 362, 367 (4th Cir. 2013) (alteration in original) (quoting De Aguilar v. Boeing Co., 11 F.3d 55, 58 (5th Cir. 1993)).

"In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 347 (1977). Moreover, courts should aggregate the value of all legal and equitable claims when determining whether the amount in controversy is met. See JTH Tax, Inc. v. Frashier, 624 F.3d 635, 639 (4th Cir. 2010). "Once jurisdiction exists, subsequent events, such as the determination that one of the aggregated claims [is] without merit, do not destroy the jurisdictional basis to dispose, on the merits, of claims" aggregating to less than $75,000.00. Griffin v. Red Run Lodge, Inc., 610 F.3d 1198, 1204 (4th Cir. 1979) (citations omitted) (reciting this principal in the context of 28 U.S.C. § 1332's former $10,000.00 amount in controversy requirement).

In addition to the amount in controversy requirement, "[s]ection 1332 requires complete diversity among parties, meaning that the citizenship of every plaintiff must be different from the citizenship of every defendant." Central West Virginia Energy Co. v. Mountain State Carbon, LLC, 636 F.3d 101, 103 (4th Cir. 2011) (citing Caterpillar, Inc. v. Lewis, 519 U.S. 61, 68 (1996)). "For purposes of diversity jurisdiction, the

citizenship of a limited liability company . . . is determined
by the citizenship of all of its members . . . ."  Id. (citing
Gen. Tech. Applications, Inc. v. Exro Ltda, 388 F.3d 114, 121
(4th Cir. 2004).

### III.  Analysis

#### A.  Amount in Controversy

As noted above, the motion to remand itself only
challenges the amount in controversy.  Hannah contends that the
notice of removal's argument regarding the deficiency of the
complaint's stipulation of damages not to exceed $75,000.00 is
"non-sensical at best" inasmuch as "Defendants' logic would
require Plaintiff to contact Defendants prior to filing suit,
inform Defendants he is going to file suit, and then ask
Defendants to stipulate to a damage amount."  ECF No. 5, at 6.
Hannah also asserts that he is "not seeking a return of [his
alleged $80,000.00] investment" and that, "under the best
scenario, [he] would be entitled to thirty (30) percent of any
net profits or distribution as a dividend from [the] business."
Id. (emphasis in original).

The defendants respond with several arguments.  First,
they contend that inasmuch as Hannah seeks a declaratory
judgment "regarding his equity ownership and partnership status

14

with respect to defendant MFFH, an ongoing business, Plaintiff is unquestionably claiming not only the right to whatever dividends or distributions might be due him through the time of expected judgment in this case, but, a share of MFFH's profits for all time." ECF No. 7, at 9.  These profits, the defendants claim, would amount to more than the $80,000.00 invested as startup capital, which is demonstrated by the April 13, 2020 and April 17, 2020 emails in which Brown, on Hannah's behalf, rejected Mullins' $85,000.00 and $110,000.00 offers to buy out Hannah's thirty percent interest in the Funeral Home.  Id. at 10.

Second, the defendants point to the value of the complaint's claim for declaratory relief, contending that "although the Complaint alleges that the Eighty Thousand Dollars ($80,000) investment made by Plaintiff equals to a thirty percent (30%) equity ownership, the declaratory judgment claim asks for a declaration that MFFH be declared a partnership, which could amount to an assertion by Plaintiff that he is entitled to up to a fifty percent (50%) ownership stake in defendant MFFH" under Kentucky law.  Id. at 11 (citing KRS § 362.235(1); KRS § 362.270).  With a business valuation of $266,667.00 ($80,000.00 being a third of that figure), the

15

defendants note that a fifty percent share in the Funeral Home would amount to equity worth $133,353.00.  Id. at 11-12.

Third, the defendants reassert the notice of removal's argument that the stipulation in the complaint was insufficient to prevent removal under McCoy.  Id. at 12-13.  They claim that for the stipulation to be effective, "the stipulation must be truly 'binding' on the plaintiff, contained in a separate document filed contemporaneously in State Court with the Complaint (pre-removal) and signed by both counsel and his client."  Id. at 13 (citing McCoy, 147 F. Supp. 2d at 485-86).

Hannah replies that the court should look to the face of the complaint to determine the amount in controversy.  ECF No. 8 (Reply in Support of Motion to Remand), at 2.  He argues that the court should disregard the emails documenting settlement offers of $85,000.00 and $110,000.00 inasmuch as he rejected these offers since "he is not interested in selling his interest in MFFH, but rather, [] seek[ing] to implement formal oversight of the business through a written partnership agreement and board of directors."  Id.  He also contends that the complaint requests thirty percent of the Funeral Home's dividends or distributions as "disgorgement of profits and restitution," which appears to be an argument against the

defendants' point regarding prospective dividends or distributions.  Id. at 3 (emphasis in original).

      With respect to stipulations concerning damages sought by a plaintiff, this court "requires a formal, truly binding, pre-removal stipulation signed by counsel and his client explicitly limiting recovery."  McCoy, 147 F. Supp. 2d at 485 (citing Hicks v. Herbert, 122 F. Supp. 2d 699, 701 (S.D. W. Va. 2000)).  "The stipulation should be filed contemporaneously with the complaint, which also should contain the sum-certain prayer for relief."  Id. (citing De Aguilar v. Boeing Company, 47 F.3d 1404, 1412 (5th Cir. 1995)).  This rule is necessary to prevent "unseemly forum gaming" by plaintiffs who strategically plead claims that would not satisfy the amount in controversy requirement and then later amend their complaints or request that juries award them more than what was pled after the time for removal has passed.  Id. at 485-86.

      The complaint and the stipulation contained therein are not signed by Hannah.  Moreover, the complaint does not contain a sum-certain prayer for relief.  Thus, under the relevant caselaw, the stipulation does not bar removal in this case.

With respect to the actual amount in controversy, the defendants' arguments are well-taken. It is clear that the object of the litigation, insofar as it concerns the claim for declaratory relief, is the court's declaration as a matter of law that Hannah has an ownership share as a partner in the Funeral Home. Absent any indication in the record that the Funeral Home has a lower valuation than it did in June 2017, the share is worth at least $80,000.00 to Hannah plus prospective profits that he would be entitled to receive as a partner. Thus, even setting aside the requests for retrospective damages on missed payments, the amount in controversy requirement is met. And aggregating the value of the claim for declaratory relief with the requests for damages, it is undeniable that the amount in controversy exceeds $75,000.00. Accordingly, the court finds that the defendants have sufficiently met their burden of demonstrating diversity jurisdiction as it relates to the amount in controversy.

## B. Complete Diversity

In response to the show cause order, the defendants argue that Mullins' affidavit as well as the annual reports filed with the Secretary of State establish that the Funeral Home is an LLC despite Hannah's decision to file an S corporation tax return in 2017. ECF No. 31, at 6-7. Moreover,

the defendants contend that Mullins is the only member of the Funeral Home inasmuch as "[p]er [Mullins'] Affidavit, after conferring with Mr. Brown, Mr. Mullins understood that he would be both sole member and manager while Mr. Hannah would a 'silent investor' entitled to a portion of the business's profits but not to be a member or have any involvement in the management of defendant MFFH."  Id. at 6.  Since Mullins is the only member of the LLC, Mullins is a citizen of Kentucky, and Hannah is a citizen of West Virginia, the defendants claim that complete diversity exists.[3]  Id. at 7.

    In response, Hannah concedes, as earlier noted, that "despite the [2017] tax filing," the Funeral Home is not an S corporation.  ECF No. 33, at 5-6.  Hannah claims that regardless of whether the court considers the Funeral Home to be a partnership or an LLC, complete diversity does not exist inasmuch as Hannah is a thirty percent owner of the Funeral Home pursuant to his agreement with Mullins and the Funeral Home is accordingly a citizen of both Kentucky and West Virginia.  Id. at 6.  Hannah further explains that he was not listed on the

---

[3]    The defendants also note that the parties would be completely diverse if the court were to consider the Funeral Home to be an S corporation inasmuch as it would be incorporated in Kentucky with a principal place of business in Kentucky.  See ECF No. 31, at 6-7.

Funeral Home's articles of organization "[b]ecause the Plaintiff wanted to serve in a silent, minority role . . . ." Id. at 6.

The articles of organization offered by Hannah demonstrate that the Funeral Home was organized as an LLC, and they bear the Secretary of State's notation stating that they were filed on June 6, 2017.  Under Kentucky law, "[t]he Secretary of State's filing of the articles of organization shall be conclusive proof that the organizer or organizers satisfied all conditions precedent to organization [of an LLC]. . . ."  KRS 275.020.  Moreover, Hannah acknowledges in his own affidavit that he directed Mullins to meet with Brown, his personal lawyer, "to file the organizational papers for the LLC with the State of Kentucky."  ECF No. 33-6, at ¶ 6.  Further, Mullins filed the 2018, 2019, and 2020 annual reports with the Secretary of State representing that the entity is an LLC.

Notwithstanding the apparently mistaken 2017 S corporation tax filing, it is evident that both Hannah and Mullins, not to mention Brown, intended to create an LLC and that an LLC was successfully organized under the laws of

Kentucky.   Thus, the court finds that the Funeral Home is a Kentucky LLC.[4]

The court must ascertain the membership of the defendant LLC to determine whether complete diversity exists. No party disputes that Mullins is a member, and his membership is reflected in the 2018, 2019, and 2020 annual reports furnished on the Funeral Home's behalf to the Secretary of State.   The only issue in dispute is whether Hannah is also a member, and the answer to this question controls whether complete diversity exists.

With regard to this issue, the court notes that "limited liability companies are creatures of statute, and their organizational and structural parameters are outlined in KRS Chapter 275."   Spurlock v. Begley, 308 S.W.3d 657, 659 (Ky. 2010) (citing Patmon v. Hobbs, 280 S.W.3d 589, 593 (Ky. App. 2009)).   Thus, the court looks to the statutory authority governing membership of Kentucky LLCs to determine whether Hannah is a member.

---

[4]    For the purposes of this opinion, "Kentucky LLC," means that the Funeral Home is a limited liability company organized under the laws of Kentucky.   The court does not use "Kentucky LLC" to reflect the entity's citizenship.

"In the context of limited liability companies, 'ownership' and 'membership' are synonymous." Id. at 660-61. For the purposes of Kentucky's LLC statutes, "'Member' or 'members' means a person or persons who have been admitted to membership in a limited liability company as provided in KRS 275.275 and who have not ceased to be members as provided in KRS 275.172 or 275.280." KRS 275.015(17). Accordingly, any individual who claims ownership and thus membership interests in an LLC must comply with KRS 275.275. That provision states, in relevant part:

> (1) Subject to subsection (2) of this section, a person may become a member in a limited liability company:
>> (a) In the case of the person acquiring a limited liability company interest directly from a limited liability company, upon compliance with an operating agreement or, if an operating agreement does not so provide in writing, upon the written consent of all members; and
>> (b) In the case of an assignee of the limited liability company interest, as provided in KRS 275.255 and 275.265.
>
> (2) The effective time of admission of a member to a limited liability company shall be the later of:
>> (a) The date the limited liability company is formed;
>> (b) The time provided in the operating agreement or, if no time is provided, when the person's admission is reflected in the records of the limited liability company; or
>> (c) The time the member is admitted under KRS 275.285(4).

KRS 275.275(1)-(2) (emphasis added).

The parties have neither produced, nor attested to the existence of a <u>written</u> operating agreement describing the conduct of the Funeral Home's business and affairs.  Indeed, the plaintiff alleges that his calls for increased oversight of the Funeral Home included the implementation of a formal operating agreement, and Hannah and Mullins each acknowledge that an operating agreement was discussed, but not implemented, during late 2019 meetings between the two.

Generally speaking, where there is no evidence of a written operating agreement, membership may only be demonstrated through evidence of the written consent of all LLC members.  <u>See</u> KRS 275.275(1)(a); <u>Spurlock</u>, 308 S.W.3d at 660.  The parties have provided no writings in which Mullins consents to Hannah being a member of the LLC, and the 2018, 2019, and 2020 filings with the Secretary of State are writings to the contrary inasmuch as they list Mullins as a member but do not list Hannah.

Additionally, KRS 275.275(1)(b) provides that assignees of an LLC may become members in accordance with KRS 275.255 and KRS 275.265.  KRS 275.255, titled "Assignment of interest," states, in relevant part:

23

(1) Unless otherwise provided in a written operating
agreement:
  (a) A limited liability company interest shall be
  assignable in whole or in part;
  (b) An assignment shall entitle the assignee to
  receive, to the extent assigned, only the
  distributions to which the assignor would be
  entitled;
  (c) An assignment of a limited liability company
  interest shall not dissolve the limited liability
  company or entitle the assignee to participate in
  the management and affairs of the limited
  liability company or to become or exercise any
  rights of a member other than the right to
  receive distributions pursuant to subsection
  (1)(b) of this section;
  (d) Until the assignee of a limited liability
  company interest becomes a member pursuant to KRS
  275.265(1), the assignor shall continue to be a
  member and to have the power to exercise any
  rights of a member, subject to the members' right
  to remove the assignor pursuant to KRS
  275.280(1)(c)2.;
  (e) Until an assignee of a limited liability
  company interest becomes a member, the assignee
  shall have no liability as a member solely as a
  result of the assignment; and
  (f) The assignor of a limited liability company
  interest shall not be released from liability as
  a member solely as result of the assignment.

KRS 275.255(1); see also KRS 275.195(1) ("A limited liability

company interest may be issued in exchange for consideration

consisting of cash, property, services rendered, or a promissory

note or other obligation to contribute cash or property or to

perform services."). On the other hand, KRS 275.265(1), titled

"Assignee of an interest as a member of the company," states:

24

> Unless otherwise provided in a written operating
> agreement, an assignee of a limited liability company
> interest shall become a member only if a majority-in-
> interest of the members consent.  The consent of a
> member may be evidenced in any manner specified in
> writing in an operating agreement, but in the absence
> of specification, consent shall be evidenced by one
> (1) or more written instruments, dated and signed by
> the requisite members.  Except as otherwise provided
> in a written operating agreement, the assignor of a
> limited liability company interest shall not
> participate in the vote, approval, or consent of the
> admission of the assignee as a member.

Read together, these statutory provisions indicate that economic interests in an LLC are separable from the ownership interests held by its members.  See Spurlock, 308 S.W.3d at 660 (noting that "simply acquiring economic rights [in an LLC] does not, in and of itself, equate to 'ownership' or 'membership' in the limited liability company.").  For an assignee who has acquired an economic interest in an LLC to become a member pursuant to KRS 275.275, he must obtain written consent from the majority-in-interest of the members as set forth in KRS 275.265(1).

Whether Hannah is actually an assignee of the Funeral Home who has acquired economic but not ownership rights in the entity is beyond the scope of this opinion.  But even assuming arguendo that he is an assignee, there is no writing in the record demonstrating Mullins' consent that he become a member.

Additionally, the court in Spurlock observed that a member holds both economic and governance rights in the LLC absent an assignment of his economic interest.  308 S.W.3d at 660; see also KRS 275.165 ("Subject to any provisions in the articles of organization, the operating agreement or this chapter restricting or enlarging the management rights and duties of any person or group or class of persons, the members shall have the right and authority to manage the affairs of the limited liability company and to make all decisions with respect thereto.").  Hannah's silent role in the Funeral Home's business affairs appears to be inconsistent with membership in a Kentucky LLC.

Hannah avers in his affidavit, as earlier noted, that pursuant to their 2017 agreement, Mullins was to "manage the day-to-day business affairs of MFFH and server [sic, serve] as the funeral director."  ECF No. 33-6, at ¶ 4.  Mullins likewise affirms in his affidavit that he understood that Hannah was to be a silent investor "uninvolved in day-to-day business of managing MFFH."  ECF No. 31-1, at ¶ 2.  And based on the allegations in the complaint, it appears that Hannah was largely uninvolved in the governance of the Funeral Home inasmuch as he did not discover most of the alleged financial indiscretions of Mullins until he audited the business in late 2019.  Perhaps the

only indications that Hannah was involved to some extent in the governance of the business are his 2017 tax filing and his decision to audit the LLC in 2019. But apart from these isolated instances, Hannah appears to have assumed the role of a passive investor in the Funeral Home rather than a member entitled to manage and govern the affairs of the entity.

Based on the foregoing, the court finds that Hannah is not a member of the Funeral Home, which in turn compels the conclusion that the Funeral Home is only a citizen of Kentucky, the undisputed state of Mullins' citizenship. Inasmuch as the plaintiff is a citizen of West Virginia and the defendants are both citizens of Kentucky, complete diversity exists.

## IV. Conclusion

Accordingly, it is ORDERED that the plaintiff's motion to remand (ECF No. 4) be, and it hereby is, DENIED.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: February 23, 2021

John T. Copenhaver, Jr.
Senior United States District Judge

27